Moncure, P.,
delivered the opinion of the court.
The plaintiff, in his petition for á supersedeas, complains that the judgment is erroneous in two respects *636 only, viz: 1st. In requiring the plaintiff to join in the demurrer to the evidence ; and, 2d, in sustaining the said demurrer. And—.
First. We are of opinion that the court did not err in . . . .7 ... requiring the plaintiff to join 111 the demurrer to evidence. It is contended that the court did err in that respect, because the gravamen of the action, being negligence, which is a question of fact and not of law, and there “being testimony tending to show “negligence, the existence of ihe negligence is a question for the jury; and especially so, when there is any uncertainty as to the facts. That negligence is a question of fact for the decision of the jury, is no good reason for its not being subject to a demurrer to evidence; for all questions of fact are^or the decision of the jury. We know of no authority for making the fact of negligence an exception to the general rule which gives to a party a right to demur to the evidence ; nor do we know of any authority for making the mere uncertainty as to the facts, a ground of exception to the general rule. The decisions of this court on the subject, which are numerous, and most of which were cited by the counsel for the defendants in error, plainly show what is the general rule, and what are the exceptions to it. In 1 Rob. Pr. old ed. pp. 349, 353, the cases which had been decided before the publication of that work are collected. In Whittington, &c., v. Christian &c., 2 Rand. 353, Judge Green lays down, both the rule and the exceptions. After referring to the English practice, he says: “ The modern practice, especially in Virginia, where it has been sanctioned by repeated decisions of this court, is to allow either party to demur, unless the case be clearly against the party offering the demurrer; or the court should doubt what facts should' reasonably be inferred from the evidence demurred to; in which case the jury is *637 the most fit tribunal to decide; 'to put all the evi'dence on both sides into the demurrer; and then to consider the demurrer as if the demurrant had admitted all that could reasonably be inferred by a jury from the evidence given by the other party, and waived all the evidence on his part which contradicts that offered by the other party, or the credit of which is impeached; and all inferences from his own evidence which do not necessarily flow from it.” Green v. Judith, 5 Rand. 1, is a decision to the same effect; and in that case the practice as laid down by Judge Green in the case just cited, is reaffirmed; and so also is Hansbrough's ex'ors v. Thom, 3 Leigh, 147. In that case it was held to be “ the settled practice in Virginia, on demurrers to evidence, that the demurrant shajl set out the whole evidence, and that the court may compel the other party to join in the demurrer, without-requiring the demurrant to make a formal admission on the record of all the issues of fact which the court may think fah’ly deducible from the evidence demurred to;” and also, that “ by demurring to the evidence the demurrant waives all evidence on his part that conflicts with that of the other party, admits the credit of the evidence de-‘ murred to, admits all inferences of fact that may be fairly deduced from the evidence, but only such facts as are, fairly dedueible, and refers it to the court to deduce the fair inferences from the evidence.” In that case Judge Cabell said: “ Voris it any objection to a demurrer to evidence, that the evidence is circumstantial, or even complicated ; as will clearly appear from the case of Stephens v. White,” 2 Wash. 203, 210. “ If the defendant choose to risk a demurrer, I can perceive nothing in the case to deprive him of the right to do so.” In Green, &c., v. Buckner’s ad’r, 6 Leigh 82, it was held to be error to refuse to compel a joinder in demurrer to evidence, where *638 the evidence is not plainly against the demurrant; and in Rohr v. Davis, 9 Leigh 30, there is the same ruling of the court. In Ware v. Stephenson. 10 Leigh 155, there was a demurrer to evidence, which was chiefly oral, and of which there was a great deal. Stanard, J., in his opinion, stated certain principles and considerations on the subject, which seem to be very reasonable. “In ascertaining the facts proved directly or by inference,” he said, “we must not be unmindful of the effect of a demurrer to evidence. By it the demurrant allows full credit to the evidence of the demurree, and admits all the facts directly proved by, or that a jury might fairly infer from the evidence; and in determining the facts inferable, inferences most favorable to the demurree will be made, in cases in which there is a grave doubt which of two or more inferences shall be deduced. In such cases it would not he sufficient that the mind of the court should incline to the inference favorable to the demurrant, to justify it in making that inference the ground of his judgment. Unless there be a decided preponderance of probability or reason against the inference that might be made in favor of the demurree,“such inference ought to be made. The demurrer withdraws from the jury, the proper triers of facts, the consideration of the evidence by which they are to be ascertained ; and the party whose evidence is'thus withdrawn from its proper forum, is entitled to have it most benignly interpreted by the substitute. He ought to have atl the benefit that might have resulted from a decision of the case by the proper fo^m. If the facts of the case depend upon circumstantial evidence, or inferences from facts or circumstances in proof, the-verdict of a jury ascertaining these facts, would not be set aside, merely because the court might have made inferences different from those made W the jury. To *639 justify the grant of a new trial, when it depends on the correctness of the decision between different inferences to be drawn from the evidence, it would not suffice that in a doubtful case, the court would have made a different inference. The preponderance of argument or-probability in favor of this different inference should be manifest. When the question is, whether or no a fact ought to he taken as established by the evidence, either directly or inferentially, in favor of the demurree, I do not know a juster test than would be furnished by the enquiry, would the court set aside the verdict, had the/' jury on the evidence found the fact? If the verdict' so finding the fact would not be set aside, it ought to he considered as established by the evidence demurred to.” Cabell, J., concurred in this opinon. Tucker, P., concurred in reversing the judgment. Brooke, J., was for affirming the judgment of the court below, which was for the demurree. He says nothing in his opinion in regard to the principles laid down by Judge Stanard; but the presumption is that his views were at least as favorable to the inferences which ought to be made in favor of the demurree. We have no reason to believe that Tucker differed from Stanard, as he said nothing on the subject, and concurred in the judgment. At all events we have the concurring opinions of Stanard and Cabell, from which neither of the other two sitting judges dissented.
Such opinions are entitled to the highest respect, and approach very near to the point of authority. We think the views thus announced are sound, and ought to govern in cases of demurrer to evidence. cWe will refer only to two more cases on the subject, taking them, as we have taken those already cited, in the order of time in which they were decided. In Tutt v. Slaughter’s adm’r, 5 Gratt. 364, there was a great deal of evidence, both oral and written. \ Allen, J., in delivering the opinion of *640 the court, reaffirmed the rule as laid down in Green v. Judith. In the Union Steamship Co. v. Nottingham, 17 Gratt. 115, negligence was the gravamen of the action, and yet there was a demurrer to the evidence.
"We have referred thus fully to the cases before cited, on account of their bearing, not only on the first, but also on the second assignment of error. They show how igreat a risk a demurrant to evidence runs; and if he is I willing to run it, he ought, generally, to be permitted to f | do so, as he does not thereby prejudice the rights of th& ¡other party, guarded as they are by the principles which we have seen apply to the case. So great is this risk ‘¡that it seems the defendant, in Green v. Judith, lost his cause by demurring to the evidence. 1 Rob. Pr., old ed. p. 352. Taking the rule aud exceptions to it as being correctly laid down by Judge Green, in the case, first (cited, of Whittington, &c., v Christian, &c., 2 Rand. 353, I the rule is, that a party has a right to demur to the evi-' dence; and the exceptions to it are, that he has no such right, when the case is clearly against him, or when the 'court doubts what facts should reasonably be inferred from the evidence demurred to. This .case falls under the general rule, and not under either of the exceptions to it.
Secondly.—We are of opinoin that the Circuit court erred in sustaining the demurrer to the evidence.
It does not appear that the plaintiff’s horses got upon the defendant’s railroad by reason of any fault or neglect on hisopart; but the contrary rather appears. He made and kept up a good and sufficient fence, on each side of the track, from the bridge across Peter’s creek, all the way to the cattle-guard, at the west end of his land; and at his only crossing of the road in that whole space, he made and kept up a sufficient gate, with sufficient fastenings, on each side of the railroad; .and it *641 does not appear that he did not use due diligence to keep the gates shut and fastened. He passed through and shut them during the same night in which his horses were killed, and before the train that killed them passed over that part of the road. He has a right to use his land through which the railroad runs, as well for pasturage as for tillage; and to a convenient way across the track, from his land on one side to his land on the other, for his plantation and other purposes. The Code, chapter 56, § 22, p. 327, declares that “ for every person through whose land the road or canal of a company passes, it shall provide proper wagon ways across the road or canal from one part of the said land to the other, and keep such ways in good repair.” There is nothing unlawful in his permitting his neighbors to use the way thus provided for him across the track, as a mill or neighborhood road. If his horses, during the night when two of them were killed and a third was disabled by the engine of the defendants, got through one of the gates and upon the railroad, by reason of the said gate having been left open by some person, without the knowledge or consent of the plaintiff, as was probably the fact, the plaintiff cannot, justly, be blamed therefor. Being without fault in this matter, he had a right to expect and require the defendants to be very careful not to injure his horses, thus found upon the l’oad. And this gives him a great advantage in this controversy. •
On the other hand there were no cattle-guards at the plaintiff’s crossing of the railroad. If there had been, the horses could only have crossed the road, and could not have gone up or down upon it. Hone of them would have been killed or injured. The plaintiff had no right to make these cattle-guards; at least without the consent of the defendants They only have a right to make them, pr permit them to be made. The plaintiff' “ men *642 tioned to the section master that there ought to be cattle guards at the crossing; who replied that it would be useless to apply, as he could not get them.” He, therefore, made no such application; the defendants knew there were no cattle-guards there, and that they would be of great advantage in preventing injury, not only to stock which might get through one of the gates and upon the railroad, but to passengers travelling over the road. It is unnecessary for us to decide, and we do not decide, in this case, whether the mere omission to make such cattle-guards, was, in itself, such negligence on the part of the defendants as made them responsible for the damage done to the plaintiff in the killing and disabling of his horses; but we think we may, at least say, that not having used that obvious precaution, the defendants ■were bound to be very careful not to injure the plaintiff’s ■horses, which were enabled to go upon the road because there were no cattle-guards at the crossing.
This being the relative position of the parties, we now address ourselves to the question, whether, according to the settled rules of law which govern the court in its decision upon a demurrer to evidence, and to which we have already referred, there was such negligence on the part of the defendants, their servants and agents, as made them responsible to the plaintiff for the injury of which he complains in this action %
If we consider the case in reference only to the evidence in behalf of the demurree and the inferences of fact fairly deducible therefrom, and so much of the evidence in behalf of the demurrant as is not in conflict with the other evidence ; which, as we have seen, is the true rule in such cases; then, we think there was, palpably, such neglect as made the defendants responsible. It appears from the evidence, so considered, that the engineer had ample time, after seeing the first horse, to *643 stop the engine before reaching the place where that horse was. He commenced whistling east of the bridge: no doubt because he saw the blind mare on the ° • road, some two or three hundred yards ahead. According to his' own admission, he could have stopped his engine within that distance, though he was going at the speed of 17 or 18 miles an hour; and so also, he could easily have stopped his engine after seeing the other horses, in full time to have avoided any iujury of them. Instead ■of that, he did not slacken his speed, according to the plaintiff’s evidence, from the time he saw the first horse, indeed from the time he first blew his whistle on the east side of Peter’s bridge, until he got entirely through to the cattle-guard. Beiug behind time hispían seems to have been, to dash through at full speed, whistling all the way; and thus scare the hoi’ses off the track, or else throw them off by his engine. .The mare that was first killed did not move from the place where she stood when she was first seen by the engineer, until she was killed and thrown off the track by the engine. She was blind, and in a deep cut, and could not get off' the road, and knew not where to go nor what to do for safety. It does not appear that any of her limbs were broken, nor wyas she run over by the train. She was probably killed by the cow-catchei’, and thereby thrown off the track, out of the way of the train, which continued to go on without interruption. In regard to the other horses, they were not driven off the road, nor overtaken until they were stopped by the cattle-guard, into which, it seems, they all were forced and crowded, and where one of them was killed and another disabled by the engine. The engineer well knew that there was no way of escape from certain destruction to the horses on the track between the crossing and the cattle-guard, except by getting on the side of the track until the train passed *644 them, or by going out at the draw-bars, supposing that they happened to be down at the time. He could not have expected the horses to get on the side of the track until the train passed them. They were too much frightened for that, by the loud whistling of the engine, the strong head-light, and the close pursuit of the train, confined, as the track was, between two fences, and running, as it did, through deep cuts and on embankments. It was extremely improbable that the bars would be down, and extremely improper in the engineer, in so important a matter, to act upon the assumption that they were down. He says, “he thought when he reached the top of the grade and saw nothing more of the horses, that they had gone out into the plaintiff’s field, through the bars near the top of the gradebut he ‘‘does not recollect that he noticed that night whether the draw bars were open or closed.” He says he “ does not think his head-lights would have extended to the draw-bars, which were about 30 feet from the track.” The evidence in behalf of the plaintiff1 shows that they were nearer than that, and could no doubt have been seen by the engineer, if he had looked that way. He ought to have looked that way; and even if he could not have seen them from the engine, he ought to have ascertained, certainly, before he passed them whether they were up or down. Ho doubt they were up; and he would have ascertained the fact to be so, if he had looked that way or made an examination. But, whether up or down, it was his duty, not seeing or knowing that the horses had made their escape, to proceed with the train very slowly, from the bars to the cattle guard, a distance of 350 or 400 yards, and thus have avoided the possibility, as in that way he would, of injuring the animals. Instead of that, he continued to go on in such speed that he drove and forced all the remaining horses *645 into the cattle guard, and killed one and disabled another of them.
We think that, according to the evidence, the engineer did not exercise reasonable and proper care m running the engine to avoid injury to the horses of the plaintiff'; that he was guilty of neglect, and even gross neglect, in regard to the same; and that in consequence of such neglect, two of the horses were killed and another one was disabled. The question now to be considered, is, whether the damage thus sustained is damnum absque injuria or not; whether the defendants are, or are not, liable therefor to the plaintiff?
We think the defendants are so liable. Their learned counsel, to show the contrary, relied very much on the case of Railroad Company v. Skinner, 19 Pa. State R. 298; also reported in Bedfield’s American Railway cases 347. We find no fault with the decision in that case. It was an action of trespass on the case for killing the plaintiff’s cow, which was at large, upon a narrow piece of unenclosed land, between the defendant’s railroad and the public highway, when the mail train came along, running at their usual speed of 25 or 30 miles an hour. When about 300 feet from the train, the cow sprang upon the track. The whistle was sounded, the engine reversed, and signal given to apply the brakes. The engine ran over the cow, and one or two cars were partly thrown off the track. Gibson, J., in delivering his very able opinion in the case, said: “ No doubt a company is answerable for gratuitous damage: but what evidence was there of such damage in this case? Absolutely none. The testimony is consistent, and it shows that the train was going at tl e usual speed; that it was within 300 feet of the spot, when the cow jumped suddenly from the ditch to the track; that the engine was instantly reversed, and the signal given to *646 brake; and that alacrity could do do more. Tbe retropulsive power at the disposal of tbe engineer was apin vain. Had he been able to stop the train in time to save the cow, be could not bave done it without PeriUin£ passengers. Granting what one of tbe witnesses testified, that tbe cow might have been seen at tbe distance of 50 rods by tbe way side, and granting that tbe train might bave been stopped within it, yet tbe engineer was not bound to stop it. He had no reason to apprehend that she would leap into the jaws of death, or that it was necessary to anticipate her.”
How, all this is very sound reasoning, and applies properly to the case in which it was used. But in tbe sequel of his opinion the judge expressed general views to which we cannot, altogether, assent, although in some respects they are sound. “ The irresponsibility of a railway company,” be, said, “for all but neglience or wanton injury, is a necessity of its creation.” (Here we have an express admission of tbe responsibility of such a company, at least for negligence or wanton injury.) “A train must make'tbe time necessary to fulfil its engagements with tbe post-office and tbe passengers; and it must be allowed to fulfil them at tbe sacrifice of secondary interests put in its way; else it could not fulfil them at all. Tbe maxim, saltes populi, would be inverted, and tbe paramount affairs of tbe public would be postponed to the petty concerns of individuals.” “It may seem cruel to make a dumb brute suffer for tbe fault of its owner; but it must be remembered that the lives of human beings are not to be weighed in the same1 scales with tbe lives of farmer’s or grazier’s stock; and that their preservation is not to be left to tbe care which a man takes of uncared for cattle. Allowing them to prowl for their food, he may not wash his bands of tbe consequences of it. In a country so obnoxious to *647 the charge of indifference to human safety, it is a high and holy charge of the courts to hold to their duty, not only those to whom it is immediately committed, but also those hy whose defaults it may be remotely endangered; and to hold them hard. We are of opinion that an owner of cattle killed or injured on a railway, has no recourse to the company or its servants ; and that he is liable for damage done by them to the company or the passengers. Now, the conclusion of this opinion of the court, “that an owner of cattle killed or injured on a railway, has no recourse to the company or its ser. vants,” could not have been intended to be used in a general sense, but only in connection with the ease before the court; for it is directly in conflict with admissions contained in the same opinion, that a company is answerable “ for gratuitous damages,” and “ for negligence or wanton injury.” At all events, the conclusion is not true, in a general sense; as is fully shown by the authorities referred to by the learned counsel'for the plaintiff
In Jackson v. Rutland & Burlington Railway Company, 25 Verm. R. 150, also reported in a note to Redfield’s American Railway Cases, supra, the court, after refering to some American cases, in which it had been held that the negligence of a railroad company, in driving their engines at the time, will not render them liable for killing cattle wrongfully upon the road, said: “ But this last proposition is expressly repudiated in the English ' cases upon the subject, and is most unquestionably unsound. The railway company cannot justify either recklessness, want of common care at the time and after the cattle are discovered, or wanton injury. But, short of that, it seems they are not liable, either upon principle or the decided cases.” In 1 Redfield, on the Law of Railways, p. 471, the learned author, speaking of the *648 opinion of Gibson, J., above referred to, says: “The opinion contains many sensible suggestions, and is curious for the enthusiasm and zeal manifested by one al- ^ ready beyond the ordinary limit of human life. These viewg pave sometimes been adopted in the jury trials in other States. But they are certainly not maintained to the full exteut m any country where the maxim sic utere tuo, id alienum non laedas prevails even to the limited extent recognized in the common law in England.” See also what is said in the same volume, p.p. 474, 475, 477,493, 498, and the cases cited. In Central Ohio Railway Company v. Lawrence, 13 Ohio R. N. S. 66, referred to on page 475, (in which the author says, the subject of the responsibility of railway companies for injury to cattle running at large and coming upon their track is very carefully considered,) it is declared, that “the owner of cattle who does not keep them wiithin his own enclosure, when he might do so by proper care, cannot require of a railway company to regulate the management and speed of their trains with reference to cattle coming upon their track. Such companies, like all others, hare a right to regulate the management and conduct of their business, solely with reference to the security of persons and property in their charge, and the meeting of their reasonable appointments in regard to them; and may make their plans, upon the reasonable and legal presumption that other persons will perform all their legal obligations towards them: and consequently that the owners of domestic animals will keep them at home, where alone they belong, and not suffer them to stray upon the track of a railway company, unless they are prepared to incur the legitimate hazards of such an exposure. But when a railway company finds cattle upon its track, it is bound to avoid damage to them, if practicable, by the same degree of effort that a prudent *649 owner of the cattle would be expected to do, properly considering the hazard both to the train and the cattle. And the proper enquiry in such a case is, whether the agents of the company exercised reasonable and proper care in running their engine, to avoid injury to the cattle of the plaintiff'.” These observations appear to be very reasonable.
But the cases just cited from the Pennsylvania, Vermont, and Ohio reports, were all cases, in which the animals destroyed or injured, were, at the time, going at large by the neglect of the owner. If, in such eases, the agents of a railroad company are bound to exercise reasonable and proper care in running their engine, to avoid injury to animals on the track, a fortiori are they bound in such a case as the one now under consideration, in which the plaintiff' was guilty of no neglect in regard to his horses getting on the railroad; in which, when they got upon the road, they were grazing upon his own land through which the railroad runs, as it was lawful for them to do; in which he had used every reasonable precaution to prevent them from getting on the road, by erecting and keeping np good fences and gates, and providing proper fastenings for the gates, and in which they got through one of the gates and upon the road, in the night time and without his default. Two of these horses having been killed and another disabled, in consequence of the neglect of the engineer of the defendants, in not exercising reasonable and proper care in running the engine to avoid such injury, we are clearly of opinion that the defendants are liable to the plaintiff for the damage thus sustained by him.
We do not mean to decide, because the question does not arise in this case, whether and to what extent and under what circumstances, a railroad company is liable for damage done to stock which happens to be upon the rail *650 road at the time by the default of the owner of such stock. It will be time enough to decide that question it arises. We mean only to decide, that in this. case, in which the horses of the plaintiff, when they were kdded and disabled, happened to be upon the defendant’s railroad without any fault on the part of the owner, the defendants were bound to use reasonable and proper care in running their engine to avoid injury to the said horses; that they neglected to use such care, in consequence of which the damage was done of which the plaintiff' complains; and that therefore he has a right to recover in this action.
If there be any public prejudice against railroad companies in controversies of this kind, which tends to prevent them from obtaining justice, as is sometimes said to be the case, it can hardly be necessary to say that certainly this court does not participate, in any degree, in such prejudice. Railroads are of great public utility, and indeed are now indispensable, as means of travel and of commerce. Those who consti’uct them ought to be regarded as public benefactors; and at all events their owners are entitled to have their' just and equal rights secured to them by law, and by the action of courts and juries. They are charged with the duty of carrying safely, the passengers whose lives are entrusted to their care; and as they are held by law to a strict accountability for the faithful discharge of this duty, which is one of paramount importance, they ought not to be prevented from properly performing it, by having to use means to avoid injuring cattle which may happen to be upon the road. But subject to this paramount duty of taking care of the passengers under their charge, it is also their duty to be careful to avoid injury to stock which may happen to be upon their road; at least when there without the fault of the owner of such stock. Bor *651 tunately for all parties concerned, the means proper to be used to avoid injury to such-stock, are generally the best means that can be used for the safety of the pas-senders.
We are of opinion that the judgment of the Circuit court is erroneous, and ought to be reversed, and judgment rendered for the plaintiff on the demurrer to evidence.
The judgment was as follows :
The court is of opinion, for reasons stated in writing and filed with the record, that the said judgment of the said Circuit court upon the demurrer to evidence in the said record mentioned, is erroneous. Therefore it is considered that the same be reversed and annulled, and that the defendant in error do pay to the plaintiff in error his costs by him about his appeal in this behalf expended. And this court now proceeding to pronounce such judgment upon the said demurrer to evidence as the said Circuit court ought to have pronounced-—it further seems to the court that the matter shown in evidence to the jury is sufficient in law to maintain the issue on the part of the plaintiff. Therefore it is considered by the court that the plaintiff recover against the defendant five hundred dollars with interest thereon to be computed after the rate of six per centum per annum, from the 9th day of November 1869, till payment, the damages by the jury in their verdict assessed, aud also his costs by him about his suit in this behalf expended. And the said defendant in mere}-, &c„
Judgment reversed.